UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. ROBERT TURCHIN, Defendant. | No. 2:15-cr-161-GEB **ORDER DENYING BAIL PENDING APPEAL** |

Defendant-Appellant Robert Turchin seeks bail pending appeal under 18 U.S.C. § 3143(b). Motion for Release on Bail Pending Appeal ("Mot."), ECF No. 248. The United States of America ("the government") opposes the motion. Opposition ("Opp'n."), ECF No. 250.

The Ninth Circuit issued an order on January 31, 2019 staying the date on which Turchin is required to surrender for the prison sentence imposed in this case until February 14, 2019, "to allow [Turchin] to file in [the Ninth Circuit], if necessary following presentation of the motion to the district court and entry of written findings by the district court." The Ninth Circuit states in United States v. Wheeler, 795 F.2d 839, 841(9th Cir. 1986): "[A] district court's reasons for its decision [on a motion bail pending appeal motion] must be adequately explained; [and] conclusory statements are insufficient [to justify the decision]."

Turchin was convicted by a jury on June 26, 2018 of one count of conspiracy to commit bribery and to commit identity fraud proscribed in 18 U.S.C. § 371 (Count Two of the Indictment), and three counts of identity fraud proscribed in 18 U.S.C. § 1028(a)(1) (Counts Eight, Nine, and Ten of the Indictment).

Turchin argues in his opening brief that his motion should be granted because the following two substantial questions are likely to result in a sentence that does not include a term of imprisonment, or a reduced sentence to a term of imprisonment less than the expected duration of the appeal process: (1) whether the district court errored when in finding paragraph 42 of the Presentence Report ("PSR") that "[t]he value of the benefit received in return for payment with respect to the defendant's conduct is at least $225,000, which warrants a 10-level increase [under] USSG §§2C1.1(b)(2) and 2B1.1(b)(1)(F); and (2) whether it was improper for a jury to convict Turchin of Counts 8-10 in the indictment since Emma Klem pleaded guilty to Counts 8-10 and took full responsibility for the criminal offenses in these Counts. Specifically, Turchin argues:

> The record indicates that Turchin did falsify several test scores between 2012 and 2015, and did so at Gill's request. However, there is no evidence that Turchin had knowledge that Gill was paid bribes, nor is there any evidence that Turchin was ever paid any bribes or money.
>
> $10,000 cash in nondescript white envelopes was found in Turchin's car, but no proof was provided of the source of that cash. It is true that Turchin's coworker Klem took cash from Gill in white envelopes, but the common thread of white envelopes I [sic] hardly remarkable. In her testimony, Klem admitted

> that she enlisted assistance of another coworker, Sylvia Horta, who she gave cash to from Gill—but Klem denied ever giving any money to Turchin.
>
> Thus, the $225,000 valuation of the conspiracy, whether that known by Turchin or received by him, is unsupported. Yet that is what accounts for a ten-level enhancement of the advisory sentence under the guidelines. But for that 10-level enhancement, Turchin would be eligible for recommendation for a non-prison term.
>
> Furthermore, the indictment alleged only three counts of identity fraud worth $11,300.
>
> . . .
>
> Emma Klem pleaded guilty to counts 8-10 and took full responsibility for it. Therefore, it was improper to convict Turchin of Counts 8-10.

Mot. at 6:13-28, 7:11-15.

The United States opposes the motion arguing neither issue presents a substantial question. Turchin replies that he "has presented the 'substantial question' that the total offense level of 28 was improperly calculated; [that he] formally objected to the calculation in several respects, as well as the sufficiency of evidence presented to support the recitation of facts presented in the Presentence Investigation Report (PSR); and [a]lthough the [district] court overruled those objections, they have been preserved for appeal and are reasonably arguable." Reply at 2:5-9, ECF No. 251.

Turchin's reply brief includes the additional asserted substantial questions that he "should be afforded a downward departure and adjustment based on his age (60+), his poor health, and record of prior good works, as argued at pages 5-6 of his formal objections" to the PSR. Id. at 3:11-14. Turchin has not

shown that the district judge's failure to depart and vary downward from the advisory guidelines involves substantial questions.

## I. STANDARD

A defendant seeking bail pending appeal must show:

> (A) by clear and convincing evidence [he] is not likely to flee or pose a danger to the safety of any other person or the community if released . . . and
>
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
>
> (i) reversal,
>
> (ii) an order for a new trial,
>
> (iii) a sentence that does not include a term of imprisonment, or
>
> (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.
>
> 18 U.S.C. § 3143(b)(1).

A "substantial question" on bail pending appeal is one that is "fairly debatable," meaning one that is "of more substance than would be necessary to a finding that it was not frivolous." United States v. Handy, 761 F.2d 1279, 1283 (9th Cir. 1985) (citations omitted). A defendant bears the burden of proving that the question presented to an appellate court qualifies as "fairly debatable." United States v. Montoya, 908 F.2d 450, 451 (9th Cir. 1990). "In short, a 'substantial question' is one of more substance than would be necessary to a finding that it was not frivolous." Id. (citing United States v. Giancola, 754 F.2d 898, 901 (11th Cir. 1985)).

The law does not require that a defendant moving for bail pending appeal demonstrate a likelihood of prevailing on appeal; it merely requires a defendant to demonstrate if their "substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial [or imposition of a noncustodial or reduced custodial sentence] of all counts on which imprisonment has been imposed." Handy, 761 F.2d at 1283 (citing United States v. Giancola, 754 F.2d 898, 901 (11th Cir. 1985); United States v. Miller, 753 F.2d 19, 24 (3d Cir. 1985). A defendant "need not, under Handy, present an appeal that will likely be successful, only a non-frivolous issue that, if decided in the defendant's favor, would likely result in reversal or could satisfy one of the other conditions" to qualify for release pending appeal. United States v. Garcia, 340 F.3d 1013, 1021 n.5 (9th Cir. 2003).

**FINDINGS AND DECISION**

The District Court previously found Turchin poses neither a flight risk nor a danger to the community, and the parties agree the appeal is not for delay. Therefore, the remaining issue is whether substantial questions exist.

Since Turchin's motion concerns sentencing findings adopted by the district judge during the sentencing phase of this case, certain of those findings are stated below, notwithstanding that certain of those findings are in the presentence report, and that such information is typically not filed on the public docket. Presentence Report, ECF No. 181.

Paragraph 9 in the PSR reveals that an agent of Department of Homeland, Homeland Security Investigations ("HIS"):

received a telephone call from an anonymous reporting person (RP). The RP indicated Mangal Gill, the owner of Central Truck Driving Schools in Lathrop, Fremont, Fresno, and Salinas, California, and his partners . . . were facilitating applicants in obtaining commercial California Driver Class A or B licenses for a fee by working with DMV employees. The RP advised Gill, . . . took the applicants to the DMV, and the DMV employee would pretend to conduct the pre-trip and driving examination by having the applicants walk around the truck and trailers without being tested. The RP indicated the fee was between $1,500 and $5,000, depending on the amount of training the applicant had already completed. The RP stated Gill . . . had also approached students at another driving school located in Lathrop and told them they were wasting their time and money at their driving school when Central Truck Driving School could take them to obtain their commercial driving licenses in a couple of days for a fee. From July 17, 2012, to November 30, 2012, the RP provided the HSI agent the names of 19 individuals who had attempted to obtain or obtained California Class A or B driver licenses [from the California Department of Motor and Vehicles ("DMV")] illegally. Subsequently, in July 2012, Immigration and Customs Enforcement (ICE) and the DMV Office of Internal Affairs (OIA) began an investigation.

10. On February 28, 2013, a Salinas DMV employee told ICE agents and DMV-OIA the CDL procedure consisted of a written/vision (medical) test and a driving test. The CDL application could be initiated without a medical exam, but the CDL license could not be issued until a medical exam was received. There are three portions to the driving test: pre- trips, skills, and the road test. Federal regulations require the DMV administer all three portions on the same date. The Salinas DMV office was not scheduling commercial driving skills and pre-trips tests due to test area construction since December 2012. The employee indicated that Gill still came to the DMV with CDL applicants. The employee advised that since he/she arrived at the Salinas DMV office, he/she noticed that Gill had unusually close relationships with [licensing-registration examiner ("LRE") **Robert Turchin** . . . The

employee stated there had been a previous DMV-OIA investigation on Gill’s students because Gill’s students began their application process in other offices in California, such as Fremont, Hayward, Gilroy, and Oakland, but took their driving tests at the Salinas DMV office.

11. DMV record checks revealed instruction permits were issued for students, but there was no entry in the electronic files indicating the students passed the written tests. The applications were initiated in the Fremont DMV office but were brought to the Salinas DMV office for the applicants to complete the driving tests. The employee indicated Gill had scheduled the driving test appointments at the Fremont DMV, but Gill continued to bring students to the Salinas DMV office. The records indicated **Turchin** was assigned to conduct a driving test on February 28, 2013, and passed an individual. The same individual had previously taken the driving test on February 7, 2013, which was conducted by Golatio Jr., and failed. The employee indicated Gill usually requested a “standby” at the corrections window. The employee further indicated some of Gill’s students did not speak English but insisted on taking the written tests in English, even though the written tests were offered in their language.

12. On various dates in 2013 and 2014, HIS[‘s] [confidential human source’s (“CHS”)] or undercover agents paid Gill money to obtain commercial CDLs, including $5,000 on one occasion for a Class A commercial CDL in which the CHS had not taken or passed either the written examination or behind-the-wheel driving examination.

15. In May 2013, Gill offered to pay a DMV representative in the Salinas DMV office, Emma Klem, to access the DMV’s computer database and alter applicants’ electronic examination records, and Klem agreed. A DMV record analysis indicated that from June 18, 2013, to January 22, 2014, Klem altered the DMV electronic records for applicants to indicate the applicants had taken and passed the behind-the-wheel driving examination for a Class A commercial CDL when they had not. The records also indicated **Turchin** was the LRE who administered the behind-the-wheel

driving tests.

16. Based on analysis of DMV records by DMV-OIA, on or about June 18, 2013, Klem, without authorization, altered the electronic DMV record for an individual to incorrectly indicate that the FBI CHS had taken and passed the behind-the-wheel driving examination for a Class A commercial CDL. The records identified **Turchin** as the LRE. . .

18. In addition to the HSI investigation, **Turchin's** manager at the Salinas DMV submitted a memorandum on October 31, 2013, to DMV-OIA in regard to **Turchin's** suspicious activity. Specifically, **Turchin's** manager indicated that on October 25, 2013, she noticed that a commercial license applicant came into the DMV to apply for a license renewal. The applicant submitted his application, took a photograph, and left with another applicant without taking any of the written examination[s] required to obtain a commercial CDL. **Turchin's** manager checked the applicant's DMV records and discovered that **Turchin** had updated the DMV record with passing written test results even though the applicant did not take any tests that day. On October 28, 2013, **Turchin's** manager saw **Turchin** assisting a commercial CDL applicant who barely spoke English. **Turchin** administered the applicant's eye examination and asked the applicant if he wanted to take the written tests that day, and if so, if he wanted to take the test in English or Punjabi. The applicant told **Turchin** that he wanted to take the tests in English. Surveillance footage showed the applicant did not take any written tests that day but took his photograph and left the DMV. A review of the DMV records revealed **Turchin** had updated the written tests for the applicant with passing scores.

19. Based on analysis of DMV records by DMV-OIA, on or about December 2, 2013, Klem, without authorization, altered the electronic DMV record for an individual to incorrectly indicate that the HSI operative had taken and passed the behind-the-wheel driving examination for a Class A commercial CDL. On December 11, 2013, an official, plastic hardcopy of a Class A commercial CDL for the HSI operative was printed in Sacramento.

20. In December 2013, Gill told the HSI operative that in exchange for $5,000, Gill could get the HSI operative's associate (OA) a Class A commercial CDL without having to take or pass . . . both the written test and the behind-the-wheel drive test. Later in December 2013, the OA deposited $2,500 into Gill's bank account and paid Gill an additional $2,500 in order for OA to obtain a Class A commercial CLD without having to take or pass the written test or the behind-the-wheel driving test.

21. Based on analysis of DMV records by DMV-OIA, on or about December 18, 2013, **Turchin**, without authorization, altered the electronic DMV record for the OA, incorrectly indicating the OA had taken and passed the written examination for a Class A commercial CDL. On January 22, 2014, Klem, without authorization, altered the electronic DMV record for an individual, incorrectly indicating that the OA had taken and passed the behind-the-wheel driving examination for a Class A commercial CDL. **Turchin** was also listed as the LRE. On or about January 24, 2014, an official, plastic hardcopy Class A commercial CDL was printed for the OA in Sacramento.

22. In March 2014, the OA deposited $3,500 into Gill's bank account for the OA's associate to obtain a Class B commercial CDL without having to take or pass the written test or behind-the-wheel test. Based on analysis of DMV records by DMV-OIA, on or about March 14, 2014, **Turchin**, without authorization, altered the electronic DMV record for the OA's associate, incorrectly indicating the OA's associate had taken and passed the written examination for a Class B commercial CDL. On April 29, 2014, Klem, without authorization, altered the electronic DMV record for an individual incorrectly indicating that the OA's associate had taken and passed the behind-the-wheel driving examination for a Class B commercial CDL. On May 1, 2014, an official, plastic hardcopy of Class B commercial CDL for OA's associate was printed in Sacramento.

23. On or about April 1, 2015, . . . search warrants for Gill, **Turchin**, and Klem's cellular phones were executed. A forensic exam of Gill's and Klem's cell phones

revealed phone calls and text messages between Gill and Klem. More than 20 CDL numbers were referenced in these text messages. Gill's phone also indicated approximately 50 CDL numbers referenced in text messages with **Turchin.** DMV records indicated many of the CDL numbers listed in the text messages had the written/behind-the-wheel driving examinations passed in the DMV records by Klem, **Turchin**, and other DMV employees.

27. **Turchin** consented to a search of his vehicle [located at the DMV test drive site] and . . . agents . . . found five envelopes that contained a total of approximately $10,000 to $15,000 cash; however, the envelopes were not seized . . . Agents seized some documents from **Turchin's** vehicle.

28. Klem initially denied to HSI agents of being bribed to issue CDLs to individuals who had not taken required written tests. When the agents informed Klem that Gill admitted to them that Gill had paid Klem more than 30 times, Klem stated she had helped Gill by not questioning the paperwork that **Turchin** had completed . . . Klem indicated she did not work with **Turchin**, but the majority of the paperwork she received was from **Turchin** . . . Klem stated in the past, Gill had told her to do this for him, and **Turchin** would finish it . . .

32. The FBI and HSI investigation led to approximately 602 Class A, Class B, or Class C commercial CDLs being suspended. The investigation determined **Turchin** was responsible for no less than 45 commercial driver licenses being issued. The estimated total bribe amount that was the result of **Turchin's** involvement was at least $225,000. This amount was derived from the investigation in which the driver had to pay $5,000 for a Class A commercial CDL without having to take or pass both the written and driving test.

42. The value of the benefit received in return for payment with respect to defendant's conduct is at least $225,000, which warrants a 10-level increase USSG §§2C1.1(b)(2) and 2B1.1(b)(1)(F). +10

Further, information contained in the government's sentencing brief constitutes evidence presented during the jury trial and is made part of the district judge's findings:

> [some of the] text messages from Gill's phone between himself and Turchin, aka 'Rabbo' . . . contained nothing more than commercial CDL numbers (e.g., C2669969). Others contained coded language, such as the last three digits of a specific CDL number (often followed by an 'm')[,] right after Turchin fraudulently accessed and updated that license. Other coded text messages to Gill included 'postage due,' which Turchin sent right after he fraudulently accessed and updated several CDLs Gill sent him. To put 'postage due' in context, looking at a sequence of events starting with Turchin sending Gill that message, is illustrative. Immediately after receiving that message, Gill responded with, 'Ok thanks Monday.' Then, the following Monday, Gill and Turchin texted about meeting for lunch. Two days later, Special Agent Frigge searched Turchin's Mercedes SUV and found, hidden deep in a trunk compartment for spare tire accessories, four to five envelopes filled with at least $10,000 in cash.

Gov.'s Response to Def.'s Objs. to PSR at 2:20-28, ECF No. 191.

The district judge also adopted the government's following requested sentencing findings:

> [T]he trial evidence [evinces] that Turchin was one of the "people" Gill needed to pay bribes to (i.e., "postage") to get fraudulent CDLs. This is supported by comparing Gill's text messages with Turchin and the DMV journals Turchin accessed and updated fraudulently (as evidenced by . . . incredible short test taking times) after getting specific CDL numbers from Gill. It is also supported by the fact that Klem testified about how Gill told her not to worry if she could not finish updating a fraudulent CDL for him—Turchin would handle it. Klem also discussed how Gill paid her for the same conduct Gill went to Turchin for

> (i.e., fraudulently accessing and updating CDL numbers), which resulted in valid permits and/or licenses being issued. Klem also stated she got paid by Gill for this activity in cash, in envelopes. On the day agents searched Turchin's car, they found at least $10,000 in cash, in envelopes, hidden in Turchin's Mercedes only days after Gill and Turchin were planning to meet. This evidence shows that Gill paid Turchin more than one bribe payment.

Gov.'s Response to Def.'s Objs. to PSR at 3:7–18, ECF No. 191. The government also asked the district judge to make the following additional findings, which are made:

> [The] trial evidence [supports the finding in the PSR that] Turchin did receive bribes from Gill . . . [T]here were three HSI operatives who paid money to Mangal Gill to get a fraudulent commercial license. [T]hose three HSI operatives did receive their commercial licenses after paying Gill. Gill also told HSI operative 1 that the money operatives paid Gill for the fraudulent licenses was for him and his people at the DMV . . . DMV records which were presented at trial . . . show that . . . two DMV employees that the worked with [Gill] were Klem and Turchin. Klem['s] testi[mony reveals that] Turchin [was] one of her co-conspirators. Klem also testified that she took money from Gill on multiple occasions in exchange for fraudulent accessing and updating licensing records which result[ed] in the issuance of official commercial driver licenses.
>
> [The trial evidence] also [contains] text messages . . . between Gill and Turchin. . . that had nothing more than California driver license numbers in addition to coded language including that postage was due.

Transcript of Proceedings Judgment and Sentence at 6:14-25, 7:1-15, ECF No. 236.

"The district court's factual findings for purpose of sentencing may be based on . . . evidence heard during trial . . ." <u>United States v. M Hamaker</u>, 455 F.3d 1316,1338 (11th Cir.

2006)(quoting United States v. Ndiaye, 434 F.3d 1270, 1300 (11th Cir. 2006)). See United States v. Felix, 561 F.3d 1036, 1042 (9th Cir. 2009)(citation and internal quotation marks omitted) (stating "sentencing judges are not restricted to information that would be admissible at trial, and that a court may consider any information, so long as it has sufficient indicia of reliability to support its probable accuracy [; and a] sentencing judge may consider a wide variety of information which would not be considered admissible at trial.").

The essence of Turchin's challenge to the sentencing findings is that the jury verdict is not supported by the trial record. When considering a challenge to the sufficiency of the evidence, judicial review involves determination of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The government argues since Turchin failed to make a motion for acquittal, under Federal Rule of Criminal Procedure Rule 29(a), the evidence is viewed:

> "only to correct plain error or to avoid manifest miscarriage of justice." *United States v. Atkinson*, 990 F.2d 501, 502 (9th Cir. 1993) (en banc). To meet that standard, Turchin will need to prove that there was an (1) error that was (2) plain and which (3) affected his substantial rights. *See United States v. Olano*, 507 U.S. 725, 732 (1993). Turchin has failed to show any error, let alone one that is plain.
>
> Opp'n. at 4:6-12.

Turchin also argues that insufficient evidence supports

the sentencing finding in paragraph 42 of the PSR, because only $11,300 is attributable to him, and therefore, only a +2 enhancement applies. The government counters the appropriate way to calculate the subject § 2C1.1(b)(2) enhancement is to apply the offense level from the tables in § 2B1.1 based on the "greatest" construction of the "amount an individual is willing to pay for the corruptly obtained benefit." Opp'n. at 5:13-21 (citing U.S.S.G. § 2C1.1, cmt. n.3.). The government also argues that even using the lowest possible rate ($3,500), multiplied by the attempted number of fraudulent licenses attributed to Turchin, still totals more than $150,000, leaving the +10 enhancement intact. Id.

The +10 enhancement in paragraph 42 is supported by the findings herein. Paragraph 32 of the PSR finds that "[t]he investigation determined Turchin was responsible for no less than 45 Class A commercial CDLs being issued." Multiplying this 45 by $5,000 (the estimated value a willing bribe-giver gives and a willing bribe-taker takes)] totals the estimated $225,000 value. This amount was derived from findings evincing that the willing bribe-giver "paid $5,000 to Gill for Class A commercial CDL" so that the bribe-giver would not have to take or pass both the written and driving test. Presentence Report ¶ 42, ECF No. 181.

**CONVICTION ON COUNTS 8-10**

Turchin also argues his conviction on Counts 8-10 (Fraud Involving Identification Documents in violation of 18 U.S.C. § 1028(a)(1)) presents a substantial question of fact, because "Emma Klem pleaded guilty to counts 8-10 and took full responsibility for [those crimes] . . . Therefore his conviction

on [t]hose counts should be reversed." Mot. at 7:6-9.

Emma Klem's guilty plea does not absolve Turchin of liability for Counts 8-10. Klem's plea agreement and plea does not evince that Klem took responsibility for Counts 8-10 as Turchin argues.

For the stated reasons, Turchin's motion is denied.

Dated: February 12, 2019

GARLAND E. BURRELL, JR.
Senior United States District Judge